Appeal No. 23-16093

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

QUINTARA BIOSCIENCES, INC.,
Plaintiff/Appellant

v.

RUIFENG BIZTECH INC., et al.
Defendants/Appellees

Appeal from the United States District Court,
Northern District of California
Case No. 3:20-cv-04808-WHA
(Judge William A. Alsup)

**APPELLANT'S OPENING BRIEF**

**LiLaw Inc., a Law Corporation**
J. James Li, Ph.D. (State Bar No. 202855)
1905 Hamilton Avenue, Ste 200
San Jose, California 95125
Telephone: 650-521-5956
Facsimile: 650-521-5955
Attorneys for Plaintiff/Appellant

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff and Appellant Quintara Biosciences, Inc. ("Quintara") hereby certifies that there is no publicly held corporation that owns 10% or more of the equity interest of Quintara.

# TABLE OF CONTENTS

I. STATEMENT OF ISSUES ................................................................. 1

II. STATEMENT OF JURISDICTION ................................................... 1

III. STATEMENT OF THE CASE .......................................................... 2

    A. The Pleaded Facts Related to the Dismissal of Trade Secret
Claims ...................................................................................................2

    B. The Stay of Quintara's Discovery and the Amended Trade Secret
Disclosure.............................................................................................4

    C. The Order Striking 7 out of 9 Trade Secret Claims................................6

    D. Appellees' Change of Counsel and Multiple Delays of Trial ................8

    E. Kamath's Pretrial Misconducts.............................................................9

    F. Kamath's Prejudicious Conduct in Pretrial Submissions ......................12

    G. Kamath's Misconducts in Opening Statement ......................................13

IV. STANDARD OF REVIEW ............................................................. 17

    A. The Decision Striking Trade Secret Claims Should be Reviewed
*De Novo*.................................................................................................17

    B. The Abuse of Discretion Standard for Denial of Motion for
Mistrial ..............................................................................................18

V. ARGUMENT.................................................................................. 19

    A. The District Court Erred in Striking Trade Secrets Claims...................19

        1. The Error of Using a Motion to Strike to Dismiss
Substantive Claims .......................................................................19

        2. The Clear Error in Applying a California Discovery Rule
instead of the Notice Pleading Standard in Dismissing
Seven Trade Secret Claims............................................................21

        3. The Power to Manage Discovery Does Not Justify Striking
Substantive Parts of the Pleading .................................................25

    B. Quintara's Disclosure Meets the CUTSA Standard .............................27

1.    CUTSA 2019.210 Is a Pleading Standard Requiring Only "Reasonable Particularity" ..........................................................27

2.    The Disclosure Provides Sufficient Notice to Defendants as to the Contours of the Alleged Trade Secrets .........................30

3.    The Order Striking Trade Secrets Was Not Harmless ................38

C.    The Order Denying Motion for Mistrial Should Be Reversed .............38

1.    A Mistrial Is the Appropriate Remedy for Misconduct During Opening Statements ........................................................38

2.    The District Court Erred in Denying Quintara's Motion for a Mistrial....................................................................................39

3.    Appellees' Counsel's Opening Statement Exceeded the Bounds of Propriety and Good Faith Warranting a Reversal ..................................................................................41

4.    The District Court Failed to Provide a Curative Instruction to the Jury ..................................................................................41

VI.    CONCLUSION............................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826 (2005) ........................................................................................................... 18, 27

*Apple Inc. v. Pepper,* 139 S. Ct. 1514 (2019) ................................................... 18, 22

*Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868 (N.D. Cal. 2018)... 25, 30

*Altavion, Inc. v. Konica Minolta Systems Lab. Inc.*, 226 Cal. App. 4th 26 ...... 23, 30

*Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F. 3d 337 (9th Cir. 1995) .38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................23

*Bat v. A.G. Edwards & Sons, Inc.*, 2008 WL 220717, *2 (D. Colo. January 25, 2008) ...................................................................................................................39

*Bayramoglu v. Estelle,* 806 F. 2d 880, 888 (9th Cir. 1986) ...................................43

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................23

*Bird v. Glacier Elec. Coop., Inc.*, 255 F. 3d 1136, 1145 (9th Cir. 2001) ...............39

*Blount, Inc. v. Trilink Saw Chain, LLC*, 2009 WL 1884625, *1 (D. Or. 2009) ......39

*Butler v. IMA Regiomontana S.A. de C.V.*, 210 F.3d 381 (9th Cir. 2000) .............18

*City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) ....40

*Dietz v. Bouldin*, 794 F.3d 1093, 1096 (9th Cir. 2015) ..........................................19

*Edens v. Brown*, 95 F.3d 54 (5th Cir. 1996) ..........................................................39

*Erie* ......................................................................................................................24

*Hallinan v. United States*, 182 F.2d 880, 885 (9th Cir. 1950) .......................... 41, 42

*In re Apple iPhone Antitrust Litig.,* 846 F. 3d 313 (9th Cir. 2017) .................. 18, 22

*In re Cedar Funding, Inc.*, 419 B.R. 807, 816 (B.A.P. 9th Cir. 2009) ....................18

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) ........29

*JobScience, Inc. v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 1724763 (N.D. Cal. May 1, 2014 ......................................................................................7

*Kehr v. Smith-Barney*, 736 F. 2d 1282, 1286 (9th Cir. 1984) ...............................39

*Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1104-05 (9th Cir. 2005) ................. 39, 41

*Rockwell Collins, Inc. v. Wallace*, No. SACV 17-01369 AG (JCGx), 2017 WL 5502775 (C.D. Cal. Nov. 10, 2017) .................................................................25

*Settlegoode v. Portland Pub. Schs.*, 362 F. 3d 1118, 1129, *amended on denial of rehearing*, 371 F. 3d 503 (9th Cir. 2004) ..........................................................38

*Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1210 (D.C. Cir. 2020) .................25

*TMX Funding, Inc. v. Impero Tech. Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 .......................................................................................... 28, 29, 30

*Trovan, Ltd. et al. v. Pfizer, Inc.*, 2000 WL 709149, *3 (C.D. Cal. 2000)....... 38, 39

*United States v. Berry*, 627 F. 2d 193, 198 (9th Cir.1980), *cert. denied,* 449 U.S. 1113 (1981)..........................................................................................................43

*United States v. Dinitz*, 424 U.S. 600, 612 (1976)......................................................41
*United States v. Hagege,* 437 F.3d 943, 958–59 (9th Cir. 2006) ............................19
*United States v. Hinkson*, 585 F. 3d 1247 (9th Cir. 2009)......................................19
*United States v. Mayfield*, 189 F.3d 895, 905 (9th Cir. 1999)...............................42
*United States v. Sherlock*, 962 F.2d 1349, 1362 (th Cir. 1989) ..............................44
*United States v. Tootick*, 952 F.2d 1078, 1085 (9th Cir. 1991) .............................44
*United States v. Ventre*, 338 F.3d 1047, 1052 (9th Cir. 2003) ...............................18
*Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). 17, 20, 21
*Yeiser Rsch. & Dev., LLC v. Teknor Apex Co.*, No. 17-CV-1290-BAS-MSB, 2019
    WL 2177658, at *4 (S.D. Cal. May 20, 2019) ....................................................24

## Statutes

17 U.S.C. § 505 ..........................................................................................................2
28 U.S.C. § 1331 ........................................................................................................1
California Uniform Trade Secrets Act ("CUTSA 2019.210"), Cal. Code Civ. Proc.
    2019.210 ...........................................................1, 4-6, 18, 23-27, 37, 45
Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. 1- 2, 4-5, 18, 22, 24-25, 27
Enabling Act .............................................................................................................24
Federal Rules of Civil Procedure ("FRCP") 12(f) ............................... 17, 19, 20, 21
Federal Rules of Civil Procedure ("FRCP")  12(b)(6)............................... 17, 20-22
Federal Rules of Civil Procedure ("FRCP") 26(b)(1)..............................................25
Federal Rules of Civil Procedure ("FRCP") 8(a)(2)................................................22
House of Representatives Report ("H.R. Rep.") No. 114-529 ................................24

## Rules

Rule 5 of United States District Court Northern District of California Guidelines
    for Professional Conduct ........................................................................................12

## Treatises

8 Wright & Miller, 5C FED. PRAC. & PROC. CIV. (3d ed.), § 1380 ...................21
8 Wright & Miller, 5C FED. PRAC. & PROV CIV. (3d ed.), § 1202....................22
8 Wright & Miller, 5C FED. PRAC. & PROC. CIV. (3d ed.), § 2008 ...................26

Plaintiff and Appellant Quintara Biosciences, Inc. ("Quintara") presents this appeal against Defendants and Appellees Ruifeng Biztech Inc. ("Ruifeng"), Gangyou Wang ("Wang"), Alan Li ("Li"), and RF Biotech LLC ("RF Biotech") (collectively "Appellees") on three orders issued by Judge William Alsup of the Northern District of California ("District Court").

## I.    STATEMENT OF ISSUES

1.    Whether the District Court may apply California Uniform Trade Secrets Act, Cal. Code Civ. Proc. 2019.210 ("CUTSA 2019.210") to strike claims which were brought solely under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 and which met the federal notice pleading standard.

2.    Whether the District Court erred in applying CUTSA 2019.210 to strike trade secret claims that properly stated the boundary of the claimed trade secrets.

3.    Whether the District Court erred in denying Quintara's motion for a mistrial following opening argument graphically comparing Quintara's owners to the notorious Bonnie and Clyde and opening argument not supported by evidence.

## II.    STATEMENT OF JURISDICTION

The District Court had the original subject matter jurisdiction over Quintara's DTSA claims under federal question jurisdiction pursuant to 28 U.S.C. § 1331.

1

The judgment appealed from was entered on July 13, 2023, which disposed of all parties' claims. 1-ER-002.

Quintara timely filed its Notice of Appeal on August 11, 2023. 2-ER-093-095. The judgment appealed from is final and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

### III.    STATEMENT OF THE CASE

### A.    The Pleaded Facts Related to the Dismissal of Trade Secret Claims

Quintara filed the suit on July 17, 2020, for misappropriation of trade secrets under the DTSA and various state law tort claims. The relevant pleaded facts are summarized below.

Quintara is a DNA sequencing company started in 2005 by a husband-and-wife team, Drs. Richard Shan and Sue Zhao. 3-ER-305:06-12. Dr. Shan has a Ph.D. in Cellular and Molecular Biology and Dr. Zhao a Ph.D. in Veterinary Sciences. *Id.* Dr. Zhao also had a master's degree in computer science and worked for many years in the field of bioinformatics. *Id.*

In 2013, to solve a cash flow issue, Quintara agreed to let defendants Wang and Ruifeng to "borrow" its business operation to support his L-1 visa application in exchange of a loan. 3-ER-305:11-313:27. This "borrowing" arrangement eventually led to Wang switching the lease of Quintara's Bay Area office to Ruifeng. 3-ER-314:01-27. All along, however, it was Quintara which owned and

operated the sequencing business; Wang, being a salt trader, knows very little about the DNA sequencing business other than borrowing Quintara's business for his visa petition. 3-ER-3011:08-20.

In late 2019, when Quintara informed Wang that it was terminating their arrangement of allowing Wang and Ruifeng to borrow its business, Wang locked Quintara out of its office in Hayward, California in March 2020, and converted all of Quintara's equipment including DNA sequencers and 11 computers as Ruifeng's computers, and hired away three of Quintara's employees to start its own sequencing business named RF Biotech. 3-ER-315:01-317:27.

The 11 computers that Wang/Ruifeng took from Quintara contain Quintara's trade secrets in the nine groups of trade secrets. 4-ER-397:03-409:13.

a. Customer database.

b. Customer profile database.

c. Marketing plan.

d. Design of potential new products.

e. Vendor database,

f. Computer software code

g. Customized reagents and protocols,

3

h. Design of new products.

i. DNA Donor Technology.

Quintara filed the suit on July 17, 2020 for fraud, conversion of tangible assets, breach of duty of loyalty, misappropriation of trade secrets, and unfair competition. The trade secret claim was solely based on the DTSA without any reference to CUTSA. 3-ER-323:21-32:28. The remaining claims were based on California law and were pleaded under the federal supplemental jurisdiction. 3-ER-322:20-325:03.

**B.     The Stay of Quintara's Discovery and the Amended Trade Secret Disclosure**

On October 16, 2020, the District Court dismissed the claims for fraud and other claims but allowed Quintara to file a motion for leave to amend, which was eventually granted except for the fraud claim. On December 22, 2020, Quintara filed its First Amended Complaint (the "FAC"). 3-ER-326:16-17.

When Quintara started to conduct discovery, Appellees demanded a trade secret disclosure under CUTSA 2019.210, even though Quintara's trade secret claim was based solely on DTSA, a federal statute.

To avoid unnecessary motion practice, Quintara served a trade secret disclosure which closely tracked its allegations in the FAC.  Defendants then filed a motion for protective order based on CUTSA 2019.210. In opposition to the

4

motion, Quintara contended that CUTSA 2019.210 does not apply to DTSA claims because whether a pleading is sufficient to allow discovery under DTSA should be governed by the federal notice pleading standard. The District Court, however, granted the motion for protective order based on its broad power to control discovery and stayed all Quintara discovery. 1-ER-019-020.

On December 2, 2020, Quintara filed and served its amended trade secret disclosure (the "Disclosure"). The Disclosure still contains the same nine trade secrets alleged in the FAC, but are further divided into 11 groups with more detailed disclosure pursuant to the District Court's order as shown in the following chart:

| Trade Secrets Claimed in the FAC (2-ER-318-319) | Trade Secrets in the Disclosure (4-ER-395-409) |
|---|---|
| a. Customer database | 1. Customer database |
| b. Customer profile database | 2. Customer profile database |
| c. Marketing plan | 3. Marketing plan |
| d. Design of potential new products. | 4. Development plans for new products and services; 5. Business plans for new products and services; |

5

| e. Vendor database | 6. Vendor database |
|---|---|
| f. Computer software code | 7. Computer informatics |
| g. Customized reagents and protocols | 8. Customized protocols and reagent recipes for current products. |
| h. Design of new products. | 9. Recipes and protocols for new products under development; and<br><br>11. IL15 fusion protein-related protocols, recipes, etc. under development. |
| i. DNA Donor Technology. | 10. New product information re DNA donor technology., |

## C.   The Order Striking 7 out of 9 Trade Secret Claims

In response to the Disclosure, Defendants filed another motion for protective order and for sanction. On December 22, 2020, the District Court denied the motion but invited Defendants to file a motion to strike the trade secret claims based on CUTSA 2019.210, citing its own case *JobScience*:

> It is time for the parties to graduate from tee-ball. The prior order barred discovery until plaintiff served a "satisfactory statement" of the asserted trade secrets. If defendants believe the disclosure unsatisfactory, they may refuse discovery and

> move to strike the trade secret claims. See, e.g., *JobScience, Inc. v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 1724763 (N.D. Cal. May 1, 2014).

1-ER-019.

Defendants thus filed a motion to strike all trade secret claims under FRCP 12(f). The District Court granted in part on March 13, 2021. 1-ER-011-018. The order struck 9 out 11 trade secrets in the Disclosure, with the two surviving trade secrets being customer profile database and vendor database. 1-ER-016:15-19. The District Court also stayed all state law claims (1-ER-018:1) and only allowed discovery to proceed on the remaining two trade secret claims—the customer profile and vendor database (1-ER-018:15-19). Thus, of nine trade secret claims pleaded in the FAC, the District Court effectively dismissed seven.

On April 14, 2021, Quintara filed a petition for writ of mandamus requesting review of the District Court decision of dismissing seven trade secrets and staying the state claims. This Court denied the petition for lack of irreparable harm. 3-ER-298.

The parties then voluntarily dismissed, without prejudice, all state claims and counterclaims and refiled them in *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc., et al.*, Case No. 21CV385112, California Superior Court, County of Santa Clara (the "State Court Case").

**D.      Appellees' Change of Counsel and Multiple Delays of Trial**

The case was originally scheduled for trial in September 2021. 3-ER-327-331. It was continued to December 2021 due to the withdrawal of Petitioners' counsel. 3-ER-296-297. Afterwards, judgement was entered against two individual defendants pursuant to stipulation. 3-ER-285-295. The remaining defendants eventually became the Appellees. On November 9, 2021, the District Court vacated the trial date due to representation issues with the two corporate appellees. 3-ER-284. On the same day, Reshma Kamath ("Kamath") filed a notice of appearance to represent Appellees, which led to the District Court vacating its previous order and setting up a new case management conference for November 18, 2021. 3-ER-284. On November 18, 2021, the District Court set a new trial date of February 14, 2022. 3-ER-283.

This new trial date never materialized, due to the refusal by Kamath to comply with the Court's covid-19 rules. Kamath filed a motion seeking an exemption from the District Court's vaccination requirements. In denying the motion, the District Court vacated the trial date indefinitely. 3-ER-272-275.  Later, the District Court tentatively set the trial on May 16, 2022. 3-ER-270-271. Due to scheduling conflict, Quintara moved to continue the trial date, which the District Court granted, setting a new trial date on December 5, 2022. 3-ER-269. The trial date was then again rescheduled for June 12, 2023. 3-ER-267-268.

**E.      Kamath's Pretrial Misconducts**

Soon after she took over the representation of Appellees, Kamath filed a Motion to Vacate the Stipulated Protective Order which was previously entered between Quintara and Appellees with Appellees' former counsel. The District Court denied the motion and found it "borderline incomprehensible." 3-ER-277:01-02.

For a settlement conference before Magistrate Judge Hixson, despite being informed on several occasions that the conference was to be conducted in person, Kamath did not show up for the conference, claiming it was supposed to be on Zoom despite her own clients attending in person. This resulted in an order to show cause ("OSC"). 3-ER-265-266. Kamath responded to the OSC with falsehood and wild accusations against Judge Hixson (which she misspelled as "Hixby"), such as "bias and prejudice," "creating boys-club atmosphere," and "unauthorized" ex parte communication with her client. 3-ER-260-264. After Judge Hixson sanctioned her (3-ER-257-259), Kamath doubled down with her wild accusations that the decision was "frivolous sanctions promulgating, sympathizing, and garnering excuses for the boys' club" (3-ER-255:01-04), that the sanctions showed "prejudice, and misogyny" (3-ER-256:08-22), and that the "Salem Witch Hunt towards minority women in the legal profession, and to those of Indian-Descent is quite visible in Judge Hixon's Order" (*id.*). Kamath emphatically stated that she

"will NOT pay such prejudicial sanctions." 3-ER-254:01-04.

After the trial, the District Court finally reviewed Kamath's objection to Judge Hixson's sanction order. The court flatly rejected Kamath's claims as being, among others, unprofessional, and ordered that she "shall pay the $5,096.61 sanctions award to plaintiff within Fourteen Days." 2-ER-103:03-05. After an extended time after the 14-day deadline, Quintara moved for contempt. In response, Kamath reiterated that she "will NOT pay any sanctions even if doubled/tripled/quadrupled by this Court … because that sanction, and re-sanction/order stem from the racial misogyny, bias and prejudice laden in the California Courts." 2-ER-83:21-25.

Shortly after the District Court issued the Order, Kamath submitted a "Further Notice of Reshma Kamath Against Judge William Alsup's Racism and White Homogeneity Promoted in San Francisco Federal Courthouse" in which she stated, among others, that "Undersigned counsel will NOT appear, and will NOT file any filings for **JUDGE HIXSON'S RACIAL MISOGYNY/**JIM LI's frivolous motion of contempt – even if it means Judge Alsup orders PRISON TIME based on his now outward and open racism." 2-ER-76:02-06.

Shortly thereafter, again on September 22, 2023, Kamath submitted a "Supplemental, Further Notice of Reshma Kamath Against Judge William Alsup's Racism and White Homogeneity Promoted in San Francisco Federal Courthouse"

10

in which she stated, among others, "**_PLEASE TAKE NOTICE_** that even if it means getting suspended and/or disbarred and/or hundreds of thousands in judgment/sanctions/liens, because of JUDGE WILLIAM ALSUP's conduct." 2-ER-071:01-04.

On September 24, 2023, Ms. Kamath filed a "Notice" in which she notified Judge Alsup, Magistrate Hixon, Quintara's counsel, and Appellees' former counsel – Dylan Wiseman of Buchalter – that she had sued each of the foregoing based on allegations of racial discrimination, gender discrimination, and defamation, among other claims, and filed a copy of the Complaint she had filed in the District Court of Arizona. 2-ER-036-064; 2-ER-065-069.

Afterwards, the District Court and Magistrate Judge Hixson jointly issued an order referring Ms. Kamath to the Standing Committee on Professional Conduct. 2-ER-030-035. In response, and immediately after receipt of the order referring her to the standing committee, Kamath filed a response in which she stated that she was filing a formal complaint against the District Court and Judge Hixson with the Commission on Judicial Performance and plainly stated that if the committee did not take action, refrained from taking action, or found inconclusive evidence, she would sue the committee in addition to others. 2-ER-026-029.

On November 13, 2023, the District Court held Kamath in civil contempt for failure to pay sanctions as ordered. 2-ER-023-025. To date, Kamath has still failed

and refused to pay the sanctions as ordered by both Magistrate Judge Hixson and the District Court, and remains subject to a *per diem* fine of $25, payable to the Court, since December 29, 2023. 2-ER-023-25.

**F.      Kamath's Prejudicious Conduct in Pretrial Submissions**

Kamath broke many court rules governing trial materials, which unfairly imposed an excessive burden on Quintara. Kamath failed to timely serve Appellees' Motions in Limine and, in fact, Appellees' Motions in Limine were not a day late but were 6 days late. 2-ER-244:24-245:10. In filing the Motions in Limine nearly a week after the deadline as set by the District Court's Standing Order, and offering absolutely no basis whatsoever as to why such were not timely served, Kamath also violated Rule 5 of United States District Court Northern District of California Guidelines for Professional Conduct[1] which provides "[t]he timing and manner of service of papers should not be calculated to disadvantage . . . the party receiving the papers." Kamath did just that by affording a mere three days to respond to Appellees' untimely motions in limine before the Final Pre-Trial Conference and defended her action by referring to the rules as "guidelines." As the District Court stated in its Final Pre-Trial Order: "… this is the first case in twenty-three years that any counsel has argued the standing order guidelines are 'only guidelines.'" 2-ER-245:19-246:05.

---

[1] https://www.cand.uscourts.gov/forms/guidelines-for-professional-conduct/

In addition, on June 21, 2023 close to midnight, Kamath filed what can be characterized as motions to strike Quintara's Motions in Limine Nos. 1, 2, and 5. Each of these purported "motions to strike" was based on the same disingenuous argument, were pure fallacy, and did nothing more than to unnecessarily increase the burdens on Quintara and the District Court. Specifically, Appellees, in bizarre fashion, claimed that Quintara had mislead the District Court as to the manner in which Quintara served its Motions in Limine Nos. 1, 2, and 5 on Appellees; more specifically, that the email service effectuated by Quintara included the Li Declaration as a separate attachment to the email whereas it was combined when submitted to the District Court. This was pure nonsense and the District Court agreed. 2-ER-244:06-14. There were other violations of the pretrial rules, such as impermissibly filing reply briefs for Motions in Limine. 2-ER-245:19-246:04.

## G. Kamath's Misconducts in Opening Statement

The District Court's standing order requires disclosure of demonstratives used in opening statements. The parties agreed to disclose their demonstratives to each other by 5 pm the day before the opening statements. Quintara disclosed its opening slides accordingly, but Appellees did not. On the first day of the trial, before the opening statements, Kamath stated that she had demonstratives to use at opening, pointing to two posters they put up in the courtroom. Quintara objected to the posters for failure to disclose. 2-ER-104:17-105:13. The district court overruled

the objections to the posters for nondisclosure although the court acknowledged the 5 pm disclosure rule; instead, the court forced Quintara's counsel to look at the posters right then and there to rule on objections in real time. 2-ER-106:23-111:20.

The posters contained timelines with the words "Bonnie and Clyde" as heading for the timeline. The District Court found that any comparison of Quintara's owners to the notorious criminals Bonnie and Clyde was too argumentative for use in opening statements. 2-ER-109-110. The District Court even suggested to "put over" the argumentative heading. 2-ER-110:9-12. However, the District Court determined that the use of phrase "misappropriation" and "secret" in Quintara's demonstrative was too argumentative for the use in opening statements. 2-ER-235. Over Quintara's objection, the District Court allowed Quintara to use such a phrase in its slides and Appellees were permitted to argue Bonnie and Clyde as stated in its posters. 2-ER-113-114.

However, Kamath went far beyond what was shown on the posters during the opening. Before she started her opening statement, she gave Quintara's counsel a USB drive to project onto the screen. However, the materials she projected were not the two posters that had been disclosed belatedly before the opening, but a whole set of PowerPower slides which she had never disclosed. 2-ER-205-232.

Nearly every slide of the entire deck contained prejudicial arguments, many of which had no evidentiary support. 2-ER-205-232. The slides started with a

14

depiction of Bunnie and Clyde, the notorious robbery and murder criminals (2-ER-206) and referred to Quintara's owners, Drs. Zhao and Shan, as the "modern-day Bonnie and Clyde" (2-ER-207). The slides then argued about the statutory languages (2-ER-210, 2-ER-229-230) and the burden of proof (2-ER-211-216). Kamath also showed various documents which she "googled" from the Internet. 2-ER-218-224; 2-ER-143:14-144:5. Kamath ended her opening "statement" by a warning to the jury: "BEWARE YOU COULD BE THE NEXT VICTIM." 2-ER-232.

When such slides were shown during Kamath's opening statement, Quintara timely objected which the court overruled. 2-ER-133:25-134:13. As a result, both Quintara and the jury were shown Kamath's highly inflammatory and prejudicial opening slides concurrently for the first time.

The prejudice to Quintara was only further compounded and amplified during Appellees' opening statement. Kamath stated: "so similar to what you saw in the 1920s and '30s in American history, we have the white collar crime with Sue and Rich now." 2-ER-135:19-21. Kamath also stated "[a]nd in this almost white collar type of crime, this is the modern-day Bonnie and Clyde who have stolen hundreds of thousands of dollars from Ruifeng's joint bank account ...." 2-ER-133:2-10.

Kamath also impermissibly played with the jury's emotions in her opening, claiming "Gangyou Wang went from CEO status pursuing his America dream in the United States to pretty much pauper status. . . He's a non-English speaking immigrant to the United States" 2-ER-148:03-10.[2] Kamath thereafter verbally threatened the jury stating they "could be the next [Bonnie and Clyde] victim[.]" 2-ER-148:11.

Prior to entrance of the jury on the second day of trial, Quintara orally moved for a mistrial. 2-ER-150:12-151:8. In denying the motion, the court found that Kamath failed to comply with the trial disclosure rule. 2-ER-153:05-09. But the court found that because "she's a brand new lawyer almost," the court had "got to cut her … a little bit of slack." *Id.* 2-ER-153:13-17. The court found no prejudice to order a mistrial because Kamath was allowed to say Bonnie and Clyde, which was not worse than showing the slides, and that it was merely argumentative not inflammatory because "Bonnie and Clyde were a modern day Robin Hood." 2-ER-155:03-06.

Upon entry of the jury, the District Court did not provide any additional instruction with respect to the evidence and the purpose of opening statements, and the District Court did not even reiterate its previous instruction to the jury that

---

[2] No "pauper status" evidence was introduced at trial and Quintara's objection was properly sustained in Appellees' closing argument. 2-ER-199:08-21.

16

counsel's statements are not evidence. As such, the highly inflammatory and prejudicial slides and statements based thereon by Appellees' counsel in opening statement were left unchecked and at the forefront in the minds of the jurors.

On July 13, 2023, the jury returned a verdict in favor of the Appellees. Judgment was then entered for Appellees. 1-ER-002

Appellees filed a post-verdict motion seeking attorneys' fees and costs which the District Court denied. 2-ER-079-081. Appellees did not file an appeal of the District Court's denial of the motion for attorneys' fees and costs, and thus, such an issue is not presently before this Court.

## IV.    STANDARD OF REVIEW

### A.    The Decision Striking Trade Secret Claims Should be Reviewed *De Novo*

Although the District Court's decision to strike matters pursuant to Fed. R. Civ. Proc. 12(f) is reviewed for abuse of discretion, the issue of "whether Rule 12(f) authorizes the District Court to strike such matter at all" is reviewed *de novo*. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)

If the decision to strike seven trade secret claims is deemed a dismissal under FRCP 12(b)(6), it is also reviewed *de novo*. *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) (reversing order granting motion to dismiss).

The District Court's decision to apply CUSTA 2019.210, a California procedural statute, to a federal question claim under DTSA should be reviewed *de novo*. *United States v. Ventre*, 338 F.3d 1047, 1052 (9th Cir. 2003) ("We review the construction, interpretation, or the applicability of a statute de novo."); *In re Cedar Funding, Inc.*, 419 B.R. 807, 816 (B.A.P. 9th Cir. 2009) ("the applicability of California's litigation privilege is a question of law which we review de novo"); *Butler v. IMA Regiomontana S.A. de C.V.*, 210 F.3d 381 (9th Cir. 2000) ("We review de novo the district court's choice and application of [Arizona] commercial code provisions.").

Assuming *arguendo* CUSTA 2019.210 is appliable in this case, which it is not, the question of whether trade secret disclosure meets the CUSTA standard is a question of law is reviewed de novo on appeal. *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 835 (2005). This is because "[t]he trade secret designation mandated by section 2019.210 is not itself a pleading but it functions like one in a trade secret case because it limits the scope of discovery in much the same way as the allegations of a complaint limit discovery in other types of civil actions." *Id.* at 833.

**B.    The Abuse of Discretion Standard for Denial of Motion for Mistrial**

Denials of motions for mistrial are reviewed for abuse of discretion. *See United States v. Hagege,* 437 F.3d 943, 958–59 (9th Cir. 2006); *see also Dietz v.*

*Bouldin*, 794 F.3d 1093, 1096 (9th Cir. 2015), *aff'd*, 579 U.S. 40 (2016). This Court uses a two-step approach for deciding abuse of discretion:

(A) a *de novo* review of "whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F. 3d 1247, 1261–62 (9th Cir. 2009).

(B) "whether the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 1262 (internal quotations omitted).

## V.  ARGUMENT

### A.  The District Court Erred in Striking Trade Secrets Claims

#### 1.  The Error of Using a Motion to Strike to Dismiss Substantive Claims

A motion to strike is designed for striking "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Procedurally, the District Court may not use Rule 12(f) to dismiss a portion of the complaint if it does not fall into one of the five enumerated grounds of the rule. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F. 3d 970, 974 (9th Cir. 2010). *Whittlestone* reversed an order dismissing portions of the complaint regarding lost profit and other damages. *Whittlestone* is thus a clear law that prohibits district courts from using Rule 12(f) to strike a substantive part of the complaint.

19

There can be no question that the District Court invited Defendants to file a motion to strike the trade secret claims—versus striking trade secret disclosure as the order later stated. 1-ER-019 ("If defendants believe the disclosure unsatisfactory, they may refuse discovery and move to strike the trade secret claims."). Nor is there any doubt that Defendants' motion was filed under Rule 12(f) for a motion to strike parts of the pleading. 3-ER-301:8-302:15.

In opposing the motion to strike, Quintara cited *Whittlestone* and informed the District Court of the impropriety of the motion to strike the trade secret claims. 3-ER-299:14-24. Quintara suggested that the court could convert the motion to strike to a motion to dismiss under Rule 12(b)(6) and explained why all the pleaded trade secret claims had met the plausibility pleading standard. 3-ER-299-302.

Realizing that *Whittlestone* explicitly prohibited what it had invited Defendants to do, i.e., moving to strike the trade secret claims under Rule 12(f), the District Court did not mention either Rule 12(f) or striking trade secret claims in its order. Instead, the order couches the dismissal of seven trade secret claims as striking part of the Disclosure and faults Quintara for treating it as a Rule 12(b)(6) motion under the notice pleading standard. 1-ER-011-018. The change of language does not change the fact that the order effectively struck a significant part of the pleaded trade secret complaint in direct contradiction to *Whittlestone*.

20

*Whittlestone* reasoned that Rule 12(f) "is neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint." Otherwise, a redundance would be created "within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose." *Id.*

There cannot be any dispute that the claims for misappropriation of the seven stricken trade secrets are "a part of a complaint." 3-ER-303-326, ¶ 69 (list of trade secrets including the 7 trade secrets). These stricken trade secrets do not fall into any of the five enumerated grounds for motion to strike under Rule 12(f). Thus, the District Court in essence did what *Whittlestone* prohibits: dismissing a portion of the complaint under Rule 12(f).

### 2. The Clear Error in Applying a California Discovery Rule instead of the Notice Pleading Standard in Dismissing Seven Trade Secret Claims

The only way that the District Court could have properly granted the motion to strike is to treat it like a Rule 12(b)(6) motion. *See* Wright & Miller, 5C FED. PRAC. & PROC. CIV. (3d ed.), § 1380 (suggesting that an "inaccurately denominated" motion to strike should be treated as "a motion to dismiss the complaint" for lack of prejudice to the "nonmoving party").[3] Instead, the District

---

[3] Quintara did suggest this conversion to Rule 12(b)(6) motion. 3-ER-299:25-26.

Court relied on its "wide discretion in controlling discovery" to strike the seven trade secret claims. 1-ER-18. There is no authority, however, to allow a District Court to use its discretion in managing discovery to override the federal notice pleading standard. Couching the dismissal as striking parts of the trade secret disclosure does not change its actual effect of dismissing seven trade secret claims based on nothing but pleadings. On such dismissal, the District Court enjoys no discretion at all because the dismissal is not a discovery matter and is reviewed *de novo* on appeal. *See In re Apple iPhone Antitrust Litig.,* 846 F. 3d 313, 317 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper,* 139 S. Ct. 1514 (2019) (reversing order granting motion to dismiss under *de novo* review).

The legal standard for dismissing the seven DTSA trade secret claims is the federal notice pleading rule, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2); *see also* Wright & Miller, 5C FED. PRAC. & PROV CIV. (3d ed.), § 1202  ("pleadings under the rules simply <u>may be a general summary of the party's position</u> that is sufficient to advise the other party of the event being sued upon" and "Rule 8 demands no more of the pleadings than this"). The notice pleading in fact merely requires the allegation of sufficient facts to make a claim "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Quintara indeed described to the District Court how its trade secret pleadings (as supplemented by the Disclosure) met the plausibility pleading standard. 3-ER-299-302. The District Court, however, did not even address the plausibility issue and dismissed seven trade secret claims on the ground that the Disclosure did not meet the standard of CUTSA 2019.210, citing its own cases as authorities. 1-ER-013-014.

To be sure, the dismissal of these seven claims is clearly erroneous under any legal standard. To use the source code as an example, Quintara describes the confidential "Computer informatics (i.e., software) that Quintara developed including (1) informatics for Sanger Sequencing automation, image processing, and data quality control, as well as for automatic data delivery; and (2) informatics for mobile online order tracking." 3-ER-303-326, ¶ 69(f). It is further described in detail including each of the source code modules. 4-ER-395-409. In light of the established law that "source code is undoubtedly a trade secret" (*Altavion, Inc. v. Konica Minolta Systems Lab. Inc.*, 226 Cal. App. 4th 26, 60), it is very difficult to understand how the District Court can dismiss such specifically identified computer code and obviously highly valuable trade secrets.

Importantly, regardless of whether the dismissal could be justified under CUTSA 2019.210, the key legal error here is to use a California discovery rule to alter the pleading standard of a federal claim. "One of the shaping purposes of the

23

Federal Rules is to bring about <u>uniformity in the federal courts</u> by getting away from local rules." *Hanna v. Plumer*, 380 U.S. 460, 472 (1965). To allow a California federal court to use a California procedural rule to change the pleading standard of the federal court violates this "uniformity" goal of the federal rules. Indeed, "when there is a Congressional mandate (the Rules) supported by constitutional authority," district courts are required to follow the federal rules notwithstanding the *Erie* doctrine. *Id.* at 473. To do otherwise would be "to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act." *Id.* at 473–74.

More and more District Courts in California have come to the conclusion that CUTSA 2019.210 does not apply to DTSA claims. In *Yeiser Rsch. & Dev., LLC v. Teknor Apex Co.*, No. 17-CV-1290-BAS-MSB, 2019 WL 2177658, at *4 (S.D. Cal. May 20, 2019), the district court found that "DTSA aims to establish a single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved." *Id.* citing H.R. Rep. No. 114-529, at 4 (2016). In furtherance of this aim, "DTSA is notable for what it does not require. DTSA does not contain any heightened pleading requirements for civil litigants." *Id.* see also, *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 882 (N.D. Cal. 2018) ("Federal Rule of Civil Procedure 9's heightened pleading standard does not apply to trade secrets cases, that Rule 8 does not have a particularity

24

requirement, and that California Civil Procedure Code § 2019.210 has no place at the pleading stage."), citing *Rockwell Collins, Inc. v. Wallace*, No. SACV 17-01369 AG (JCGx), 2017 WL 5502775 (C.D. Cal. Nov. 10, 2017).

Although courts still apply CUTSA 2019.210 in claims based on both DTSA and CUTSA, the District Court is the only court in the country that applies CUTSA 2019.210 to pure DTSA claims to block discovery and is the only court to strike DTSA claims based on CUSTSA 2019.210.

> **3.    The Power to Manage Discovery Does Not Justify Striking Substantive Parts of the Pleading**

The District Court justified striking the seven trade secrets on its inherent authority to control discovery. 1-ER-012. This was a legal error. Rule 26 defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FRCP 26(b)(1). Thus, discovery is limited to information relevant and proportional to the pleaded matters. *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1210 (D.C. Cir. 2020) ("As with all discovery requests, courts must look carefully to the complaint's allegations to determine if the requested discovery is relevant and proportional to the needs of the case"), citing Rule 26(b)(1). The relevant claims here are the nine pleaded trade secrets. Thus, information relevant and proportional to the nine pleaded trade secrets should have been the scope of discovery but in fact were not,

25

with only two out of the nine trade secrets were allowed discovery, effectively striking seven trade secrets out of the pleading.

The District Court's ruling was certainly not based on any proportionality test. Instead, the court found seven out of nine trade secrets were insufficiently pleaded for lack of specificity under CUTSA 2019.210. 1-ER-013-018. The District Court initially prohibited *any* discovery (including non-trade secret claims) for lack of specificity of the trade secret claims. 1-ER-020-021. The court then invited Appellees to file a motion to strike (1-ER-019) and granted that motion in part by striking all but two trade secrets—the customer profile and vendor database (1-ER-011-018). Thus, the District Court was using the purported insufficiency of the complaint to block discovery which is not permitted under the federal rules. 8 Wright & Miller, § 2008 ("Discovery is not to be denied because it relates to a claim or defense that is being challenged as insufficient."). Contrary to what it claims, the District Court did not use CUTSA 2019.210 to sequence discovery; it used the California rule to block discovery on matters which the court considered insufficiently pleaded. Such order in substance is dismissal of the seven trade secret claims, regardless of the label used.

In sum, the District Court abused its power to manage discovery as a tool for dismissing claims, thus circumventing the notice pleading standard. If such

"backdoor" dismissal of complaint is allowed, the notice pleading standard would be eviscerated.

In any event, the Disclosure indeed met the standard of CUTSA 2019.210 as discussed below assuming *arguendo* it is applicable to DTSA claims.

## B.     Quintara's Disclosure Meets the CUTSA Standard

### 1.     CUTSA 2019.210 Is a Pleading Standard Requiring Only "Reasonable Particularity"

"The trade secret designation mandated by section 2019.210 is not itself a pleading but it functions like one in a trade secret case because it limits the scope of discovery in much the same way as the allegations of a complaint limit discovery in other types of civil actions." *Advanced Modular Sputtering, Inc.,* 132 Cal. App. 4th at 833.

As a pleading rule, CUTSA only requires reasonable particularity:

> [T]he proponent of the alleged trade secret is not required, on pain of dismissal, to describe it with the greatest degree of particularity possible, or to reach such an exacting level of specificity that even its opponents are forced to agree the designation is adequate. We question whether any degree of specificity would satisfy that lofty standard. What is required is not absolute precision, but "reasonable particularity."

*Id.* at 836.

Thus, "a plaintiff need not spell out the details of the trade secret." *Alta Devices, Inc.*, 343 F. Supp. 3d at 881. The plaintiff is only required to "describe the subject matter of the trade secret with sufficient particularity to separate it from

27

matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.*

In *Alta Devices*, the plaintiff identified the trade secrets by descriptions in terms more general than the terms used in this case:

> The Confidential Information and trade secrets imparted by Alta to LG[E] includes Alta's Methods of: high throughput thin-film deposition; epitaxial lift-off of the thin-film; and GaAs substrate maintenance and re-use. It includes confidential cost analysis; proofs and tests of manufacturing concepts and techniques; tool roadmaps; manufacturing process flows; and identification of equipment and equipment vendors; and information related to the foregoing.

*Id.* at 881; 3-ER-303-326, ¶ 69. Although an NDA attached to the pleading in *Alta Devices* included a list of confidential information, it is no more particular than Plaintiff's Disclosure. *Id.* at 881; *cf.* 4-ER-395-409.

As noted by *Alta Devices*, such styles of identification have been found to be sufficient under CUTSA. *Alta Devices*, 343 F. Supp. 3d at 882 (discussing *TMX Funding, Inc. v. Impero Tech. Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 (N.D. Cal. June 17, 2010). In *TMX*, the court found the following identification of trade secrets sufficiently particular under CUTSA:

> TMX alleges nine broad categories of trade secret information including

28

> Its software, source codes, data, formulas, and other technical information developed as proprietary and confidential products and services;
>
> b. Its business methods and marketing plans, such as prospective customer and sales methods for attracting and retaining customers;
>
> c. Its product information, including, but not limited to, cost, pricing, margin data and other financial information;
>
> …
>
> h. Special buying and service needs, buying and service patterns, agreements with customers, and buying preferences of customers, including special terms, discounts, and accessories;
>
> j. Login and password information to access the computer networks, servers, computer systems, and telephone systems.

*TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL

2509979, *4 (N.D. Cal. June 17, 2010). Such disclosures are no more particular

than Quintara's disclosure of the seven stricken trade secrets.

In *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir.

2020), the plaintiff merely identified the trade secrets "[a]t the highest level of

generality":

> the InteliClear System's unique design and concepts and the unique software, formulas, processes, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data.

*Id.* at 658. This simple description was sufficient to carry the case through the

pleading stage, although the district court later granted motion for summary

judgment for defendant. *Id.* at 657. This Court reversed, finding disputed issues of facts as to whether the trade secrets existed. *Id.* at 659.

Cases like *TMX*, *Alta Devices,* and InteliClear provide yardsticks as to boundaries of the reasonable particularity standard under CUTSA. As discussed below, Quintara's identification of trade secrets falls within the boundaries.

> **2.      The Disclosure Provides Sufficient Notice to Defendants as to the Contours of the Alleged Trade Secrets[4]**
>
> **a.      Computer Source Code**

The source code is described in the FAC as "computer informatics" that Quintara developed for sequencing automation, image processing, data quality control, data delivery and mobile online order tracking. 3-ER-319:15-17.

The Disclosure further states that the "compositions and functionalities" of the source code "is not available publicly" and is "of high value to anyone who wants to emulate Quintara's business." 4-ER-400:19-21.

Even with these general descriptions, it is difficult to see how the District Court could find the source code was not trade secrets at the pleading stage. After all, confidential source codes have long been established as trade secrets. *See, e.g., Altavion, Inc.*, 226 Cal. App. 4th at 60 ("source code is undoubtedly a trade

---

[4] Because of the space limitation, only 4 out of the seven stricken trade secrets are discussed.

secret"). The Disclosure also provided more detailed description of the modules or subsystems contained in the source code.

### (1) The Disclosure Identified Specific Software Modules

The Disclosure describes the following modules for the trade secret of computer source code:

(a) "qbonline": a customer relationship management system "designed and programmed inhouse by Quintara" and forms "the core logics of Quintara's online order, data delivery and billing system." 4-ER-400:22-28. qbonline has been gradually developed since 2011 and contains "more than 2000 code files, with more than 40,000 lines of codes." *Id.*

(b) "qblib": a managing system of workflow, including software "to interact with major machines like DNA sequencers and computer servers." 4-ER-401:4-13. It also "interacts with excel spreadsheets and pdf files and uses statistic software packages for graphing and reporting." For example, qblib contains "a module named 'machineai' which uses artificial intelligence algorithms" control DNA sequencers. *Id.* If a capillary is blocked, machineai "automatically flags all samples" through the capillary as "failure." It also "runs daily checks of each capillary status, creates status reports, and emails the reports to the right people." *Id.*

(c) "qbpy": a data analysis system containing "scripts"—short execution programs—for various functionalities including sequencing quality control, customizing data analysis designed for different customers, antibody discovery protocols, and CRISPR target analysis. 4-ER-401:14-24.

(d) "Labscan": a system working with qbonline for customer order tracking and logistics support. 4-ER-401:25-27.

(f) "SparkDNA": a plasmid map viewing, editing, and sequencing trace alignment system. 4-ER-402:1-5.

The above description delineates the boundary of the source code at issue. It provides sufficient notice to Appellees what trade secrets are being claimed.

### (2) The District Court's Conclusory Statement Confused Trade Secrets with Patents

The District Court used a broad brush to dismiss the source code as trade secrets. The court ignored the most important modules in the code: qbonline, qblib, qbpy, and Labscan. 1-ER-015-016. The court conveniently used the last and least significant module, SparkDNA, to illustrate its position. *Id.*

The court's criticism of SparkDNA was inapposite. The court stated that "plaintiff does not disclose the matter that makes this code valuable." As discussed above, value of SparkDNA was disclosed as three folds: (1) it is confidential code (i.e., not publicly available) which took Quintara more than a year and $122,272 to

32

develop (4-ER-402:01-05), (2) it is a module working together with the main modules like qbonline, qblib and qbpy to form the informatics system (4-ER-400-402), and (3) it allows the user to edit, view, and align plasmid map sequences. 4-ER-402:01-02.

The District Court did not address any of the disclosures about SparkDNA. The court made a conclusory statement that there was no disclosure that "makes this code valuable." 1-ER-015:27-28. The court did not say why a confidential source code—which was developed with a significant amount of resources and which was useful in the way of allowing its owner to edit, view, and align plasmid map sequences in functional cooperation with the other modules of the source codes—was not valuable at the pleading stage. The court merely asserted that the disclosure "essentially claims the entire sub-field of computer code." 1-ER-016:1. This patent-like language reveals the fact that the court was judging a trade secret like a patent. The value of a trade secret is its secrecy affording competitive edge to the owner of the secret. It does not require ground-breaking ideas required for a patent. The fact that the module is useful and not available publicly should be sufficient for its value. It is by no means prohibiting others from writing their own code to accomplish the same idea and functionality. Thus, to say allowing the source code to be trade secret is "essentially claim[ing] the entire sub-field of computer code" (Id.) is to confuse trade secret law with patent law.

33

The court also never addressed the obvious problem of its approach: the source codes included many other modules and the value of SparkDNA should not be viewed in isolation. Even assuming SparkDNA by itself does not meet the "value" criteria of a trade secret, which it does, the module still has its value by being a part of several interconnected source code modules to allow the owner of the group to achieve higher productivity in DNA sequencing. For example, the source code for Microsoft Word is obviously secret, although there is other word processing software available such as Word Perfect. However, a small module of the Word source code for printing document may not have much value in isolation. This does not mean the printing module is not a trade secret because its value is its being a part of the functional integrity of the Word.

More importantly, it is illogical to judge the value of the source code, which contains many other modules besides SparkDNA, based on the value or lack thereof on SparkDNA. To do so would be like judging the value of Word source code based on its printing module.

Thus, it is a legal error for the District Court to use SparkDNA, a small module of the source code at issue, to deny the trade secret status of the source code.

34

### b. Customized Reagents and Protocols

The FAC describes this trade secret as customized reagents and protocols for Sanger Sequencing services that Quintara developed in-house, including workflow, lab protocol, and reagent kits suited for different kinds of customer samples." 3-ER-319:15-17. The Disclosure further describes the trade secret as "an optimal set of protocols and reagent recipes" which improve on the standard protocols. 4-ER-395-409. As an example, the Disclosure compares a standard PCR[5] protocol, which is known to the industry, with one of Quintara's customized Protocols which differs significantly in its procedures and complexity while also offering a higher success rate. 4-ER-402.

In dismissing the customized reagents and protocol as trade secret, the District Court faulted Quintara for only providing a single example of the customized protocols—the customized PCR protocol—and went on to dismiss the disclosed PCR protocol. 3-ER-319:06-20. Both decisions were legal errors.

There cannot be much dispute that Quintara's customized PCR protocol is a trade secret at the pleading stage. It is not publicly known and it affords its owner "a higher success rate" than the standard public protocol. 4-ER-402:14-24. The District Court asserted that Quintara "did not describe the background of the secret

---

[5] "PCR" stands for Polymerase Chain Reaction," a method of rapid producing DNA molecules with known sequences.

and how it brings value by virtue of not being generally known." The court, however, did not explain why the "higher success rates" with different DNA samples was not a description of the value of the customized protocol for being not generally known—at least at the pleading stage.

Nor should the District Court dismiss the entire category of trade secret for having only a single example. At the pleading stage, the issue here is whether Plaintiff should be allowed to conduct discovery as to the trade secret of customized protocols. The valid example shows sufficient support for allowing such discovery. The description provides Appellees with a blueprint of defense— obtaining these customized protocols from Quintara through discovery and proving they were either not trade secrets or Appellees did not misappropriate them.

### c. Design of New Products

The FAC describes this trade secret as "new product designs of Quintara's special reagent kits for DNA amplification, DNA cleanup, and DNA sequencing." ECF 54, 16:18-19. The Disclosure describes two trade secrets under this category: new reagent kits (4-ER-402:25-404:26) and "IL15 fusion proteins." 4-ER-407:24-408:04.

For the new reagent kits, a long list of specific implementations is provided. 4-ER-337-338. This specific list of reagents which give Defendants a map as to how to defend against this trade secret claim. For the IL15 fusion proteins, the

disclosure describes them as "a series of recombinant proteins with altered IL15 activities comparing to the native cytokine IL15"—the activity may be "tuned" down. 4-ER-407:25-28. Again, this description affords a clear path as to how to conduct discovery on this claim, by seeking the designs of the altered activity. The District Court did not offer any specific comments about these two trade secrets, but merely dismissed them along with the others.

### d.     DNA Donor Technology

The FAC describes the trade secret as "Quintara's new DNA Donor Technology for effective and precise CRISPR-based genome editing." 3-ER-319:21-22. The Disclosure states that the technology was developed by Dr. Shan in collaboration with his graduate study advisor, Dr. Christopher Voigt of MIT. 4-ER-405:8-14. The patent for the technology is owned by MIT, but the trade secret involved in Quintara's unique implementation of the technology is owned by Quintara. 4-ER-405:15-20. This trade secret includes "implementation designs, protocols, reagent recipes, testing data, and other related information." 4-ER-405:22-23. The Disclosure provides a long list of specific items included in the trade secret. 4-ER-405:28-407:23. Thus, Appellees were provided sufficient notice as to the boundary of the trade secret.

The District Court did not address this trade secret at all but dismissed it nonetheless as insufficient under CUTSA.

37

### 3. The Order Striking Trade Secrets Was Not Harmless

The District Court initially stayed all discovery pending "a satisfactory [trade secret disclosure]." 1-ER-020-021. The District Court then allowed only discovery to proceed on the two trade secret claims—customer profile and vendor database—which had survived the motion strike. 1-ER-017:15-18. Thus, Quintara never had any opportunity to conduct discovery or present evidence regarding the seven dismissed trade secret claims. The order striking the seven trade secret claims should be reserved.

### C. The Order Denying Motion for Mistrial Should Be Reversed

#### 1. A Mistrial Is the Appropriate Remedy for Misconduct During Opening Statements

"A mistrial is the appropriate remedy for persistent prejudicial attorney misconduct." *Trovan, Ltd. et al. v. Pfizer, Inc.*, 2000 WL 709149, *3 (C.D. Cal. 2000) (*citing Anheuser-Busch, Inc. v. Natural Beverage Distrib*., 69 F. 3d 337 (9th Cir. 1995). "A mistrial is particularly warranted where 'the flavor of misconduct…sufficiently permeates the entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Id.*, (*citing Anheuser-Busch, Inc.*, 69 F.3d at 346).

"Where conduct permeates the proceeding, the jury is 'necessarily prejudiced.'" *Id*. (citation omitted); *Settlegoode v. Portland Pub. Schs.*, 362 F. 3d 1118, 1129, *amended on denial of rehearing*, 371 F. 3d 503 (9th Cir. 2004)

38

(*quoting Kehr v. Smith-Barney*, 736 F. 2d 1282, 1286 (9th Cir. 1984); *see also Blount, Inc. v. Trilink Saw Chain, LLC*, 2009 WL 1884625, *1 (D. Or. 2009) (applying *Settlegoode* and *Kehr* standard for motions for new trial to motion for mistrial based on references to inadmissible evidence in opening statement).

However, to permeate the trial, the misconduct does not have to occur throughout the whole trial. *Bird v. Glacier Elec. Coop., Inc.*, 255 F. 3d 1136, 1145 (9th Cir. 2001).

### 2. The District Court Erred in Denying Quintara's Motion for a Mistrial

In the Ninth Circuit, counsel's misconduct during opening statement and closing arguments has been held to warrant a mistrial. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1104-05 (9th Cir. 2005) (affirming grant of mistrial and sanctions based on a single comment in counsel's opening statement); *see also Anheuser-Busch, Inc.*, 69 F.3d at 347; *see also Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149, *34 (C.D. Cal. 2000) (granting defendants' motion for mistrial where plaintiffs' counsel made improper arguments during closing argument and ignored court rulings in order to introduce inadmissible evidence); *see also Edens v. Brown*, 95 F.3d 54 (5th Cir. 1996); *see also Bat v. A.G. Edwards & Sons, Inc.*, 2008 WL 220717, *2 (D. Colo. January 25, 2008).

In order to determine whether the misconduct of counsel was prejudicial and warrants a new trial, the Court examines, on a case-by-case basis, "the totality of

the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself." *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).

Here, as set forth above, in Appellees' opening statement, counsel for Appellees engaged in extensive arguments relying on a set of slides which had never been disclosed as required and were shown to the jury and Quintara at the same time. The slides contained many inappropriate arguments such as the graphic comparison of Quintara's owners to Bunnie and Clyde. 2-ER-205-232. These inflammatory slides were much amplified by counsel's words during her opening statement (2-ER-132-133,135) and closing argument (2-ER-176:14-16, 186:7-9, 187:18-20). Counsel stated in her opening: "so similar to what you saw in the 1920s and '30s in American history, we have the white collar crime with Sue and Rich now." 2-ER-134:19-21. Counsel also stated in the opening:"[a]nd in this almost white collar type of crime, this is the modern-day Bonnie and Clyde who have stolen hundreds of thousands of dollars from Ruifeng's joint bank account …." 2-ER-133:2-4. This argument twisted a business dispute into high crimes to appeal to jury's passion, which is highly prejudicial for an opening statement.

40

Counsel also played with the jury's emotions in her opening statement, falsely claiming "Gangyou Wang went from CEO status pursuing his America dream in the United States to pretty much pauper status" (2-ER-148:3-5), which had no evidentiary support as shown by the district court's ruling during the closing (2-ER-199:11-18). Counsel thereafter verbally threatened the jury stating they "could be the next [Bonnie and Clyde] victim[.]" 2-ER-148:11. Appellees' last power point slide reinforced Appellees' threats to the jury, stating that they too "could be the next victims" of the modern-day Bonnie and Clyde in reference to Shan and Zhao. In *Lasar*, the Ninth Circuit affirmed the grant of a mistrial for a single comment during opening statement that was far less prejudicial than Appellees' counsel's outright comparison of Shan and Zhao to the notorious robbers.

3. **Appellees' Counsel's Opening Statement Exceeded the Bounds of Propriety and Good Faith Warranting a Reversal**

"An opening statement has a narrow purpose and scope." *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J. concurring). "It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate to parts of the evidence and testimony to the whole; it is not an occasion for argument." *Id*. Opening statements must be made within the bounds of propriety and good faith. *Hallinan v. United States*, 182 F.2d 880, 885 (9th Cir. 1950). Indeed, opening statements "must be kept within proper bounds,

41

otherwise all manner of irrelevant and extraneous subjects could be stated to the jury and, in the absence of good faith, counsel could thus place before a jury much that he well knew could not later be introduced to evidence." *Id.*

Appellees' opening statement was rife with improper statements not made in good faith and within the bounds of propriety. *Hallinan*, *supra*, 182 F.2d at 885. Appellees' wrongfully compared Shan and Zhao to the notorious robbers and murderers Bonnie and Clyde. 2-ER-132-133,135. Kamath further threatened the jury that "they" could be the next victims of Shan and Zhao. 2-ER-148:11. Appellees' prejudicial comparison continued in their closing argument claiming that Shan and Zhao are the "Bonnie and Clyde team that goes around the country from Richmond to San Fransico to Hayward, and then Boston now, conning people the name of investment and biotechnology." 2-ER-187:18-20. There is no evidence for such outrageous statements. "[I]n some situations, counsel's arguments may be so blatantly prejudicial that reversal is warranted even if they are supported by sizeable evidence." *United States v. Mayfield*, 189 F.3d 895, 905 (9th Cir. 1999). Given Appellees' prejudicial opening statements and lack of adequate notice of their inflammatory power point slides, a reversal is warranted.

Appellees' Counsel also showed jury something which will not be in evidence, but was something she had "just googled," and told jury "you can just download that data from a slew of different websites." 2-ER-145:14-146:5. The

42

district court overruled Quintara's objection on this point. 2-ER-146:16-20.

Kamath warned the jury that their decision in this case would have "a major

impact" on a separate state court action. 2-ER-147:10-16.

Whereas Quintara's closing statement complied with the law, 2-ER-156-

173, Appellee's closing statement completely ignored the law, bearing little

resemblance to a proper closing by presenting essentially nothing but arguments.

2-ER-174-204. Appellee's counsel Kamath started her closing by arguing that "it's

a common technique that manipulators and deceivers use to sway people …." 2-

ER-174:21-23. Kamath argued that "Quintara failed to meet its burden of proof in

showing and demonstrating …." 2-ER-175:1-4. Kamath then lectured the jury on

the preponderance of evidence standard. 2-ER-175:5-14. Kamath went on to "urge

the jury not to fall prey to this kind of gaslighting." 2-ER-175:15-16.

### 4. The District Court Failed to Provide a Curative Instruction to the Jury

"A timely instruction from the judge usually cures the prejudicial impact of

evidence unless it is highly prejudicial or the instruction is clearly inadequate."

*United States v. Berry*, 627 F. 2d 193, 198 (9th Cir.1980), *cert. denied,* 449 U.S.

1113 (1981); *accord Bayramoglu v. Estelle,* 806 F. 2d 880, 888 (9th Cir. 1986).

Where prejudicial arguments are made, curative instructions must be proper

and timely in order to neutralize any prejudice. *United States v. Tootick*, 952 F.2d

1078, 1085 (9th Cir. 1991). Indeed, a trial "judge must actively supervise the trial

43

and, if necessary, reiterate instructions in the wake of prejudicial effects." *Id*.; *see also United States v. Sherlock*, 962 F.2d 1349, 1362 (th Cir. 1989) ("Although the court gave the limiting instructions *before* closing argument, no instructions followed the prosecutor's prejudicial remarks.") (emphasis in original).

Here, no curative instruction was given to the jury immediately after Appellees' opening statement nor as a reminder after Quintara's motion for mistrial was made the following morning.

Here, the District Court, following denial of the oral motion for a mistrial, and following entry of the jury, did not provide any additional instruction with respect to the evidence and the purpose of opening statements and did not even reiterate its previous instruction to the jury that counsel's statements are not evidence. This is critical as the District Court, itself, found that the use of the slides by Appellees in the opening statement (which had not been shown to counsel for Quintara the day before as required) was prejudicial to Quintara yet took no steps to cure or marginalize such prejudice. 2-ER-52-153. As such, Appellees' highly inflammatory and prejudicial slides and statements based thereon by their own counsel in opening statement was left unchecked and at the forefront in the minds of the jurors.

44

## VI.   CONCLUSION

For the foregoing reasons, Quintara respectfully requests that the Court:

a.  Reverse the November 18, 2020, order (Dkt. 40) that stayed discovery pending satisfactory trade secret disclosure under CUTSA 2019.210.

b.  Reverse the December 22, 2020, order (Dkt. 53) that invited Appellees to file a motion to strike trade secrets under CUTSA 2019.210.

c.  Reverse the March 13, 2021, order (Dkt. 87) that struck seven trade secret claims: source code, customized protocols and reagents, design of new products, and DNA donor technology.

d.  Reverse order denying Quintara's motion for a mistrial

e.  Vacate the jury's verdict in favor of Appellees.

f.  Remand the matter to the District Court and order a new trial with proper discovery.

## STATEMENT OF RELATED CASES

There is no related case pending in this Court under Cir. R. 28-2.6.

Dated: February 23, 2024 **LILAW INC.**

By: s/ J. James Li

J. James Li, Ph.D.

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-16093_____

I am the attorney or self-represented party.

**This brief contains ____11,132____ words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
   Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/J. James Li_____ **Date** _2/16/2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

47